# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>SCOTT MICHAEL HARRY,<br><br>    Defendant. | No. CR17-1017-LTS<br><br>**ORDER** |

_____

This matter is before me on a Report and Recommendation (R&R) (Doc. No. 34) and Supplemental R&R (Doc. No. 55) in which the Honorable C.J. Williams, Chief United States Magistrate Judge, recommends that I deny defendant's motion (Doc. No. 20) to suppress and supplemental motion (Doc. No. 53) to suppress.

## I.     BACKGROUND

### A.   *Procedural History*

On June 7, 2017, the grand jury returned an indictment (Doc. No. 2) charging defendant Scott Michael Harry (Harry) with one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Harry filed a motion (Doc. No. 20) to suppress on July 24, 2017. The Government filed a resistance (Doc. No. 24) on July 28, 2017. Judge Williams held a hearing on August 3, 2017. During that hearing, the following exhibits were admitted into evidence:

- Government Exhibit 1 - confidential informant (CI) contact record
- Defense Exhibit A – a video of the traffic stop

Judge Williams issued his R&R (Doc. No. 34) on August 8, 2017. Harry's counsel withdrew and new counsel was appointed for Harry on August 9, 2017. Harry filed his objections (Doc. No. 49) to the R&R on September 27, 2017, along with a

motion (Doc. No. 48) requesting permission to file an amended motion to suppress. Judge Williams held a hearing on the motion on October 13, 2017, and Harry filed his supplemental motion (Doc. No. 53) to suppress that same day. The parties indicated they had no new evidence to present regarding the supplemental motion. *See* Doc. No. 54. Judge Williams issued his Supplemental R&R (Doc. No. 55) on October 23, 2017. Harry filed objections (Doc. No. 59) on November 6, 2017. Trial is currently scheduled to begin December 18, 2017.

### B. Relevant Facts

Judge Williams made the following findings of fact in the initial R&R:

> Dubuque Drug Task Force investigator Adam Williams began working with a [CI] in the summer of 2016, after the CI had been arrested. At that time, Investigator Williams spoke with the CI who told him, among other things, that Scott Harry was involved with transporting methamphetamine into the Dubuque area. Investigator Williams was familiar with both defendant and Dennis Thul and their physical descriptions.[1] After the CI had been released from jail in later 2016, he made contact with Investigator Williams to let Investigator Williams know he was out of jail.
>
> On February 10, 2017, at approximately 11:00 AM, Investigator Williams received a text message from the CI stating that "Scott" had left Dubuque around 4:00 AM to "pick up," that the CI believed "Scott" would be driving approximately four hours each way for the meeting, and that the CI expected "Scott" to return from Dubuque around noon. The CI further indicated that "Scott" would be riding with Dennis Thul in a newer white, single-cab pickup truck that was registered to Dennis Thul's father, Dale Thul. Investigator Williams also filed a report detailing this information. This was the first tip the CI provided to Investigator Williams. At approximately 12:24 PM that same day, the CI informed Investigator Williams by text message that defendant was expected to return to Dubuque in about one hour. The text message indicated that defendant and his companion were then driving and were roughly one hour's drive away from Dubuque.

---

[1] Note that both defendant and Dennis Thul are white males.

Based on this information, law enforcement officers identified two different pickup trucks registered to Dale Thul, one of which matched the description given by the CI. Officers set up surveillance on roads leading to Dubuque. Investigator Williams subsequently observed a truck matching the description of the subject truck travelling on Highway 151 toward Dubuque. Investigator Williams, who was driving an unmarked police vehicle, pulled in behind the truck and ultimately passed it. Although he could not look at the faces of the occupants, Investigator Williams otherwise concluded that this was the truck driven by defendant based on the CI's description and Investigator Williams' familiarity with defendant and Thul. Investigator Williams called Dubuque County Deputy Daniel Kearney, whom Investigator Williams knew was also patrolling Highway 151, to inform him of the sighting.

A short while later, Deputy Kearney, a K9 officer who was traveling southbound on Highway 151 (away from Dubuque) observed the subject pickup truck travelling northbound on Highway 151. Deputy Kearney used his radar gun to record the pickup truck travelling 75 miles per hour in a 65 mile per hour zone. Deputy Kearney routinely calibrated his radar gun himself using two different methods: at the beginning of each shift, Deputy Kearney verified the accuracy of the radar gun by comparing the speed recorded by the radar gun against a second, objective measurement of speed, and at the beginning of each work week, Deputy Kearney used tuning forks to ascertain the accuracy of the radar. Additionally, the radar gun was calibrated by the manufacturer on an annual basis; the radar was up to date on its manufacturer-calibration as of February 10, 2017. Deputy Kearney further testified that based on his own visual observations and significant experience as a seasoned law enforcement officer tasked with enforcing traffic laws that it was his belief that defendant was travelling in excess of the speed limit. The radar's recorded speed served to confirm Deputy Kearney's visual observations.

Deputy Kearney crossed the median and pulled in behind the pickup truck. When Deputy Kearney caught up with the pickup truck and reached a safe location he then activated the lights on his patrol vehicle and pulled the white pickup truck over. Deputy Kearney was also familiar with defendant and Thul from past contact. When he approached the pickup truck from the passenger side and made contact with the occupants, he confirmed defendant's identity as the driver and that of Thul as passenger. During discussions with Deputy Kearney, defendant estimated that he was travelling 70 miles per hour in the 65 mile per hour zone.

3

>       Within a few minutes of stopping the pickup truck, Deputy Kearney retrieved his K-9 unit and the dog alerted on the truck. Following the alert, law enforcement officers searched the pickup truck. Officers located approximately 691 grams of methamphetamine in the bed of the truck.

Doc. No. 34 at 2-4 (footnote in original). Judge Williams found both officers to be credible. *Id.* He made the following additional findings of fact in his Supplemental R&R:

>       On February 10, 2017, at approximately 12:50 p.m., Deputy Kearney stopped the vehicle driven by defendant in Dubuque County, Iowa. Deputy Kearney is the Dubuque County Sheriff canine officer and at the time of the stop, he had a canine in his patrol car with him. At 12:51 p.m., Deputy Kearney spoke with the driver about the speeding violation, obtained defendant's driver's license in relation to that mission, and returned to the patrol car. At 12:52 p.m., Deputy Kearney discussed conducting a canine search with Investigator Adam Williams, who was also present at the scene to advance the drug investigation. At approximately 12:52:54 p.m., Deputy Kearney removed the canine from the patrol car and had the canine conduct a sniff search of the vehicle's exterior. The canine hit on the vehicle at approximately 12:53:17 p.m. Deputy Kearney placed the dog back in the patrol car at approximately 12:53:55 p.m.
>
>       At 12:55 p.m., Deputy Kearney instructed defendant to exit the vehicle, patted defendant down, and placed him in the patrol car. At 12:58 p.m., Deputy Kearney continued to process the traffic violation, advising defendant that he would issue him a warning rather than a traffic citation. Deputy Kearney then proceeded to write defendant a warning ticket while Investigator Williams physically searched the bed of the pickup truck. Investigator Williams located methamphetamine inside a PCV pipe that was lying in the bed of the pickup truck at 1:03 p.m.
>
>       At 1:16 p.m., Investigator Williams read defendant his Miranda rights and began to question him. Defendant initially denied knowledge of the drugs, but later made several incriminating statements.

Doc. No. 55 at 2-3.

## II. STANDARD OF REVIEW

A district judge must review a magistrate judge's R&R under the following standards:

> Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

### III. DISCUSSION

In his original motion (Doc. No. 20) to suppress, Harry argues that Kearney did not have probable cause or reasonable suspicion to stop the vehicle. Judge Williams considered: (1) whether Kearney had probable cause to believe Harry was traveling in excess of the speed limit and (2) whether the CI's information supported a reasonable suspicion that Harry was engaged in drug trafficking justifying an investigatory stop. He found the stop was justified on both grounds.

Harry objects only with regard to whether the CI's tip generated reasonable suspicion. Therefore, I will review that issue de novo. *See* Fed. R. Crim. P. 59(b). I find no clear error with Judge Williams' conclusion that Kearney had probable cause for the traffic stop based on the excessive speed of Harry's vehicle.

With regard to the Supplemental R&R (Doc. No. 55), Harry argues that (1) the canine sniff improperly extended the stop and (2) the officers did not diligently pursue the mission of the stop. I will review these issues de novo as well.

#### A. *Reasonable Suspicion Based on CI's Tip*

Harry argues the CI tip did not provide reasonable suspicion to stop the vehicle because the CI had no track record of providing reliable information, he or she had a significant criminal history including felony convictions involving dishonesty, received $250 in exchange for information and the information provided was not specific. Judge Williams concluded the totality of the circumstances provided reasonable suspicion for Kearney to perform the investigatory stop. Doc. No. 34 at 7. He noted that while this was the first tip provided by the CI (meaning the CI had no track record of reliability), the tip had sufficient identifying information such that the officers were able to independently corroborate enough information to create reasonable suspicion. *Id.* The information provided by the CI included: the approximate time Harry would be traveling from Dubuque, that Dennis Thul would be with Harry and that the two would be traveling in a late model white, single-cab pickup truck registered to Dale Thul. *Id.* Law

6

enforcement officers were able to verify that Dale Thul had two white pickup trucks registered in his name, one of which matched the CI's description. *Id.* at 8. Williams also observed that truck traveling north on Highway 151 toward Dubuque with two white males inside. He contacted Kearney, who then stopped the truck after determining it had been speeding. *Id.*

Judge Williams acknowledged that the CI was incorrect about which of the two men would be driving the vehicle and that Williams was not able to make out the faces of the two white males in the truck and verify they were indeed Harry and Dennis Thul prior to the stop. *Id.* However, he found that at the time of the stop, officers had corroborated enough of the CI's tip to believe the rest of the information provided would likely be accurate. *Id.* Therefore, he concluded that the officers had reasonable suspicion to believe that criminal activity was afoot and that an investigatory stop would be appropriate. *Id.*

Harry compares the facts of this case to those in *United States v. Manes*, 603 F.3d 451 (8th Cir. 2010). Judge Williams quoted *Manes* as to the general legal standard for assessing the reliability of a CI tip. However, he did not rely on its holding or its factual similarity to this case. While I agree with Harry that there were more indicators of reliability in *Manes* (including a six-month history of providing reliable intelligence), that does not mean the tip in this case was unreliable.

Even if an informant has no track record of providing reliable information to law enforcement, "police may deem an informant credible and make a finding of probable cause when an informant's information is at least partly corroborated." *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013). "An informant may also prove himself to be a reliable source for law enforcement by providing predictive information about a meeting time or place." *Id.* Here, the CI provided predictive information and officers were able to independently corroborate some of the details provided by the CI. The CI told officers the identity of the defendant and his friend, Dennis Thul. The CI also identified the type of vehicle they would be in – a "big newer white truck" with "no back

7

seat." *See* Doc. No. 31. The CI stated this truck would be registered to Dennis Thul's dad, Dale Thul. Finally, the CI was able to let law enforcement know when the truck was approximately an hour away from Dubuque. *Id*. Based on other information, law enforcement suspected that Harry was bringing methamphetamine into Dubuque from either Marshalltown or Des Moines. *See* Doc. No. 44 at 73-74. This gave officers a good idea of where to look for a newer white pickup truck traveling to Dubuque.

As Judge Williams noted, officers were able to corroborate that Dale Thul had two white pickup trucks registered under his name, one of which matched the CI's description. As predicted by the CI, this truck was spotted traveling northbound on Highway 151 at the approximate time provided by the CI. *See* Doc. No. 44 at 52. Williams was able to verify that two white males were in the pickup and that the license plate matched the one registered to Dale Thul. *Id*. at 52-53. All of this took place prior to the stop. Based on the corroborated details and the accurate predictive information provided by the CI, I find the tip provided law enforcement reasonable suspicion to justify an investigatory stop. *See Manes*, 603 F.3d at 456 ("As the Supreme Court has made clear, '[when] an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity.'"); *Alabama v. White*, 496 U.S. 325, 331 (1990) (finding an anonymous informant's tip that described an individual's identity, location, vehicle, approximate time of departure and destination, in addition to a statement that the individual would be in possession of cocaine, had been sufficiently corroborated to generate reasonable suspicion and justify an investigative stop).

### B.     *Extension of Traffic Stop for Canine Sniff Search*

Harry argues the canine sniff impermissibly extended the length of the traffic stop by at least eight minutes. He relies on *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), and an Illinois appellate court decision interpreting *Rodriguez*. *Rodriguez* held that "a police stop exceeding the time needed to handle the matter for which the stop was

8

made violates the Constitution's shield against unreasonable seizures." *Rodriguez*, 135 S. Ct. at 1612.

Judge Williams began his analysis by referring to his finding in the initial R&R that Kearney had reasonable suspicion of ongoing drug activity to stop defendant. Doc. No. 55 at 3. If there was reasonable suspicion to support the stop, then Kearney's temporary seizure of Harry to conduct the canine sniff search was constitutional. *Id.* Judge Williams also found that even if Kearney did not have reasonable suspicion at the time he stopped the vehicle, a canine search of the exterior of the vehicle during a traffic stop did not violate the Fourth Amendment. *Id.* at 3-4.

As noted above, I adopt Judge Williams' finding that Kearney had reasonable suspicion to believe the vehicle was involved in drug activity to justify an investigatory stop. While a traffic violation provided another reason to stop the vehicle, the purpose of the stop was to investigate whether the occupants were transporting drugs, not violating traffic laws. A two-and-a-half-minute canine sniff does not exceed the time needed to investigate whether a vehicle contains any drugs. *See Rodriguez*, 135 S. Ct. at 1612 (holding that "a police stop exceeding the time needed *to handle the matter for which the stop was made* violates the Constitution's shield against unreasonable seizures") (emphasis added). The length of the stop was not excessive

Even if there was not reasonable suspicion, the canine sniff did not unreasonably prolong the time needed to process a traffic violation. Judge Williams analyzed the sniff as a two-and-a-half-minute pause during the mission of the traffic stop. *See* Doc. No. 55 at 7-8 (calculating two-and-a-half minutes from when Kearney returned to the patrol vehicle with defendant's license and when the canine hit on the vehicle). I find that this description is actually generous, in Harry's favor. Williams testified, and the video of the traffic stop shows, that while Kearney was conducting the canine sniff, Williams proceeded to verify Harry's information. *See* Doc. No. 44 at 55 ("I did identify it was Scott Harry and Dennis Thul in the vehicle, and then I assisted Deputy Kearney with the traffic stop as far as processing, vehicle registration, driver's license status, wants and

9

warrants, *while Deputy Kearney was deploying his K-9 on the vehicle*.") (emphasis added); Defense Ex. A. In other words, the sniff and the routine processing of a traffic violation occurred simultaneously. *See United States v. Roberts*, 687 F.3d 1096, 1099 (8th Cir. 2012) ("Following a traffic stop, police officers may conduct "a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning.") (internal quotation omitted). There was no pause in processing the traffic violation to conduct the canine sniff.

*Rodriguez* restricts only the temporal element of the investigation rather than its content. In other words, *Rodriguez* does not preclude a dog sniff during a traffic stop even though a dog sniff has nothing to do with investigating a traffic violation. The Court noted that "a dog sniff is not fairly characterized as part of the officer's traffic mission," *see Rodriguez*, 135 S. Ct. at 1615, but stated that the "critical question" was "whether conducting the sniff 'prolongs' – *i.e.*, adds time to – 'the stop.'" *Id*. at 1616. In other words, if the sniff can be done within the time it takes to process the traffic violation, then it is not unlawful. *See United States v. Fuehrer*, 844 F.3d 767, 773 (8th Cir. 2016) (finding no violation of *Rodriguez* where one officer completed tasks related to the traffic stop while the other conducted a dog sniff that resulted in a hit). Because there was no break in processing the traffic violation in order to conduct the dog sniff here, I find that it complies with *Rodriguez* and did not prolong the traffic stop.

### C.     *Officers' Diligence in Pursuing Traffic Violation*

Similar to the above objection, Harry argues that Kearney did not diligently process the traffic violation. He argues that Kearney did not begin processing the citation until after the canine search. As explained above, Williams testified, and the video shows, that Williams began verifying Harry's information while Kearney performed the canine sniff. *See* Doc. No. 44 at 55 ("I did identify it was Scott Harry and Dennis Thul in the vehicle, and then I assisted Deputy Kearney with the traffic stop as far as

10

processing, vehicle registration, driver's license status, wants and warrants, while Deputy Kearney was deploying his K-9 on the vehicle."); Defense Ex. A. "An officer may complete routine tasks during a traffic stop, which 'can include a computerized check of the vehicle's registration and the driver's license and criminal history, as well as the preparation of a citation or warning.'" *Fuehrer*, 844 F.3d at 772 (quoting *United States v. Ovando-Garzo*, 752 F.3d 1161,1163 (8th Cir. 2014)). "However, once an officer finishes the tasks associated with a traffic stop, 'the purpose of the traffic stop is complete and further detention . . . would be unreasonable unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention[.]'" *Id.* at 772-73.

Here, as noted above, the events took place as follows:

- 12:50:00 – Kearney turns his lights on, pulls the vehicle over and approaches the passenger side of the vehicle
- 12:51:02 – Williams begins to approach the driver's side of the vehicle
- 12:51:47 – Kearney returns to vehicle
- 12:52:10 – Williams returns to vehicle and Kearney tells him he has to run the name and address since Harry does not have a license on him
- 12:52:54 – Kearney deploys canine
- 12:53:17 – Canine identifies presence of drugs[2]

*See* Defense Ex. A. Once the canine alerted to the presence of drugs, officers had probable cause to believe the vehicle contained drugs and could lawfully perform a search of the vehicle. *See United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010) ("[A]n alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle."). At that point, the

---

[2] The canine "alert" is out of camera view, but Kearney can be heard at this time praising the dog and bringing him back to his vehicle. Harry does not challenge the reliability of the dog's alert.

scope of the investigation had expanded to a drug investigation and officers were no longer obligated to complete tasks associated with the traffic stop.

There is no evidence to suggest that the officers did not diligently process the traffic violation in the four minutes between the time the vehicle was pulled over and the canine alerted. The canine deployment and the routine verification of information occurred simultaneously. Once the canine alerted to the presence of drugs, the scope of the investigation broadened and the officers were no longer obligated to pursue the traffic violation.

## IV.　CONCLUSION

For the reasons set forth herein, defendant's objections (Doc. Nos. 49 and 59) are **overruled**. I hereby **accept** Judge Williams' R&R and Supplemental R&R (Doc. No. 34 and 55). Defendant's motion (Doc. No. 20) to suppress and supplemental motion (Doc. No. 53) to suppress are both **denied**.

**IT IS SO ORDERED.**

**DATED** this 14th day of November, 2017.

_____
　　　　　　　Leonard T. Strand, Chief Judge