**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR17-1017-LTS |
| vs. | **SENTENCING OPINION AND STATEMENT OF REASONS PURSUANT TO 18 U.S.C. § 3553(c) EXPLAINING A POLICY DISAGREEMENT WITH THE METHAMPHETAMINE GUIDELINES** |
| SCOTT MICHAEL HARRY, | |
| Defendant. | |

This case came before me for sentencing on May 31, 2018. At the conclusion of the hearing, I sentenced defendant Scott Michael Harry to 280 months imprisonment and 10 years of supervised release. While I explained the reasons for this sentence on the record, I have prepared this opinion to memorialize and expand upon my comments.

## I. RELEVANT PROCEDURAL HISTORY

### A. *Indictment and Trial*

On June 7, 2017, the Grand Jury returned an indictment (Doc. No. 2) charging Harry with one count of possession with intent to distribute methamphetamine after having been previously convicted of a felony drug offense. Specifically, the indictment alleged that on or about February 10, 2017, Harry "did knowingly possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, which contained 50 grams or more of pure (actual) methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 851." Doc. No. 2 at 1. Harry filed a motion to suppress evidence

and a supplemental motion to suppress evidence, both of which were ultimately denied. The case then proceeded to a jury trial, which began on December 19, 2017.

The evidence at trial indicated that on February 10, 2017, Harry and another individual were in the process of transporting 666.3 grams of methamphetamine from Des Moines, Iowa, to Dubuque, Iowa, when their vehicle was stopped. The methamphetamine, which was later determined to be 97.1% pure, was located after a drug detection canine alerted on the vehicle. In an interview with law enforcement, Harry admitted that he knew the methamphetamine was in the truck and provided information about the source and the intended recipient. In addition, three cooperating witnesses testified to Harry's involvement with methamphetamine distribution prior to February 10, 2017. Harry testified on his own behalf and, among other things, denied knowing that any methamphetamine was in the vehicle when it was stopped on February 10, 2017.

On December 20, 2017, the jury returned a unanimous verdict (Doc. No. 82) of guilty as to the charged offense. In addition, the jury made unanimous findings that Harry was responsible for both (a) 500 grams or more of methamphetamine mixture and (b) 50 grams or more of actual (pure) methamphetamine. Doc. No. 82 at 1.

B. *The Presentence Report and Guidelines-Related Objections*

On May 2, 2018, United States Probation (Probation) filed the amended and final presentence report (PSR) for this case. Doc. No. 95. In the offense conduct section of the PSR, Probation held Harry responsible for 666.3 grams of ice methamphetamine[1] based on the drugs located in the vehicle on February 10, 2017. PSR ¶ 4. Probation

---

[1] The United States Sentencing Guidelines (Guidelines) define "ice" methamphetamine as being any mixture or substance containing methamphetamine that is "of at least 80% purity." *See* USSG § 2D1.1(c) note (C).

also found Harry to be responsible for 1,134 grams of additional ice methamphetamine based on the trial testimony and proffer statements provided by the cooperating witnesses. PSR ¶¶ 7, 11. Thus, Probation concluded that Harry should be held accountable for involvement with a total of 1,800.3 grams (or 1.8 kilograms) of ice methamphetamine. PSR ¶ 21. Pursuant to USSG § 2D1.1(c)(2), this quantity of ice methamphetamine equates to a base offense level of 36, as it is at least 1.5 kilograms but less than 4.5 kilograms. *Id*. Harry objected to the PSR's drug quantity calculations and took the position that he should be held accountable only for the 666.3 grams of methamphetamine located in the vehicle on February 10, 2017.

After determining a base offense level of 36, the PSR recommended two increases to the offense level: (1) a two-level increase pursuant to USSG § 2D1.1(b)(1) because the offense allegedly involved the possession of a dangerous weapon and (2) a two-level increase pursuant to USSG § 3C1.1 based on Harry's alleged obstruction of justice. PSR ¶¶ 22, 25. Harry objected to both proposed increases. In its sentencing brief and during the sentencing hearing, the Government indicated that it did not intend to seek, or prove, the "dangerous weapon" enhancement. However, the Government did advocate in favor of the obstruction of justice increase, relying largely on Harry's trial testimony.

With regard to Harry's criminal history, the PSR assessed a total of 17 criminal history points, putting him squarely in Criminal History Category VI (which applies to 13 or more criminal history points). PSR ¶ 66. Harry objected to a three-point assessment concerning the conviction described in paragraph 45 of the PSR but acknowledged that even if this objection was sustained, he would remain as a Criminal History Category VI, with 14 criminal history points.

*C.  My Guideline Findings*

Neither party offered evidence during the sentencing hearing, relying instead on the trial record and the PSR. After hearing arguments, I made the following findings:

a. I overruled Harry's objections concerning the drug quantities assessed in the PSR and found that the PSR correctly held him responsible for 1,800.3 grams of ice methamphetamine, resulting in a base offense level of 36 pursuant to USSG § 2D1.1(c)(2).

b. I sustained Harry's (unresisted) objection to paragraph 22 of the PSR, thus declining to impose a two-level increase pursuant to USSG § 2D1.1(b)(1).

c. I overruled Harry's objection to paragraph 25 of the PSR and imposed a two-level increase pursuant to USSG § 3C1.1 based on my finding that Harry provided false testimony during his trial.

d. I sustained Harry's objection to the assessment of three criminal history points based on the conviction described in paragraph 45 and found that no points should be assessed.

Based on these findings, I determined that the total offense level was 38 and Harry's Criminal History Category was VI, resulting in an advisory Guideline range of 360 months to life in prison.

## II.  THE MOTION FOR DOWNWARD VARIANCE

Prior to the sentencing hearing, Harry's counsel filed a sentencing memorandum (Doc. No. 98) that included a motion for downward variance. In addition to pointing out facts about Harry's history and characteristics, the motion argued that the Guidelines are unnecessarily harsh with regard to actual (pure) methamphetamine, treating such methamphetamine ten times more severely than methamphetamine mixture.[2]  Doc. No.

---

[2] Because the actual methamphetamine Guidelines and the ice methamphetamine Guidelines are identical, I will refer to them jointly as the "actual (and ice) methamphetamine Guidelines."

98 at 10-11. Counsel asserted that there is no empirical basis for this distinction and contended that the distinction is unfair because the vast majority of methamphetamine seized at this time is highly pure. *Id*. at 11. In support, counsel cited the recent decision by my colleague, United States District Judge Mark W. Bennett, in *United States v. Nawanna*, No. CR 17-4019-MWB, 2018 WL 2021350 (N.D. Iowa May 1, 2018). The Government resisted the motion for downward variance. Doc. No. 99.

### III. THE NAWANNA DECISION

In *Nawanna*, Judge Bennett noted that the Guidelines establish a 10-to-1 ratio in their treatment of actual (and ice) methamphetamine, as compared to methamphetamine mixture. *Nawanna*, 2018 WL 2021350, at *5. Judge Bennett then referenced his decision in *United States v. Hayes*, 948 F. Supp. 2d 1009 (N.D. Iowa 2013), in which he first announced his policy disagreement with the methamphetamine Guidelines. *Nawanna*, 2018 WL 2021350, at *5. After addressing the ability of a federal district court to deviate from the Guidelines on the basis of a policy agreement,[3] Judge Bennett set forth various reasons as to why he continues to have a policy disagreement with the methamphetamine Guidelines, including:

> 1. The 10-to-1 ratio established in the Guidelines is not based on empirical evidence, creating Guideline ranges for actual (and ice) methamphetamine that are excessive and not "heartlands."
>
> 2. Drug purity is not an accurate proxy for culpability in light of the fact that nearly all methamphetamine trafficked in recent years has been substantially pure.

*Id*. at *5-8.

---

[3] *See, e.g., United States v. Beckman*, 787 F.3d 466, 499 (8th Cir. 2015).

In *Hayes*, Judge Bennett found the appropriate remedy to be a one-third reduction in the advisory range when that range was calculated pursuant to the actual (and ice) methamphetamine Guidelines. 948 F. Supp. 2d at 1031. In *Nawanna*, Judge Bennett noted that the defendant before him, "unlike Hayes, was not merely a low-level, generally non-violent addict dealer." 2018 WL 2021350, at *9. Thus, Judge Bennett concluded that a more-precise remedy was to reject the actual (and ice) methamphetamine Guidelines and "treat[ ] all the methamphetamine attributable to Nawanna as methamphetamine mixture." *Id*. This requires computing an alternative Guidelines range using the methamphetamine mixture Guidelines. *Id*. In Nawanna's case, doing so resulted in a base offense level of 32 instead of 36 (based on just over 4.4 kilograms of methamphetamine). *Id*. Of course, Judge Bennett recognized that even this alternative Guidelines range is not binding, as the sentencing judge must consider all of the other relevant factors in determining the appropriate sentence. *Id*.

### IV. MY EXPERIENCE (AND ULTIMATE RESOLUTION)

I assumed office as a United States District Judge on February 12, 2016, less than three years after Judge Bennett issued his decision in *Hayes*. Understandably, I received repeated requests from various defense attorneys to adopt that ruling and implement the "*Hayes* reduction." As a new district judge, entirely lacking in sentencing experience (and, therefore, context), I found such a step to be premature. I did, however, quickly reach an impression that the actual (and ice) methamphetamine Guidelines tended to suggest a sentencing range significantly above what otherwise would seem to be a "sufficient, but not greater than necessary" sentence.[4] This initial impression became firm as I gained experience sentencing defendants in other kinds of controlled substance

---

[4] *See* 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.").

cases – especially heroin and fentanyl. After presiding over a series of trials involving defendants charged with conspiracy to distribute heroin and fentanyl resulting in death and/or serious bodily injury, I was amazed by the massive disparity in the base offense levels as between heroin and actual (and ice) methamphetamine. As a hypothetical, consider a defendant with a Criminal History Category of IV who is found to be responsible for conspiring to distribute either (a) 500 grams of heroin or (b) 500 grams of 95% pure methamphetamine. The heroin conspirator would have a base offense level of 26 and, assuming no increases or reductions in the offense level, an advisory Guidelines range of 92-115 months.

The methamphetamine conspirator would be subject to the ice methamphetamine Guidelines (80% purity or higher) and, therefore, would have a base offense level of <u>34</u>. Again assuming no increases or reductions in the offense level, the resulting advisory Guidelines range would be <u>210-262 months</u> – more than twice the range of the heroin conspirator.[5] Why? Is ice methamphetamine more than twice as potent, dangerous, destructive or addictive than heroin? I am aware of no objective evidence – from the United States Sentencing Commission or otherwise – supporting such a proposition.[6]

---

[5] To be precise, both the low end and the high end of the ice methamphetamine conspirator's range would be 2.28 times higher than the low end and high end of the heroin conspirator's range.

[6] I note that the same hypothetical defendant would face the following offense levels and resulting advisory Guideline ranges if held responsible for the distribution of 500 grams of the following controlled substances:

| | |
|---|---|
| Cocaine: | Level 24; Advisory Guideline Range of 77-96 months |
| Cocaine Base (Crack): | Level 30; Advisory Guideline Range of 135-168 months |
| Fentanyl: | Level 30; Advisory Guideline Range of 135-168 months |

*See* USSG § 2D1.1(c).

Meanwhile, the same hypothetical defendant who has the "good fortune" to be held responsible for distributing 500 grams of a methamphetamine mixture (i.e., under 80% pure or purity undetermined) will face a base offense level of 30 rather than 34. Again assuming no increases or reductions in the offense level, the resulting advisory Guidelines range would be 135 to 168 months. This is still higher than the advisory range for heroin, but the low end of this range is more than six years less than the low end of the range applicable to 500 grams of ice methamphetamine. Again, why? There seems to be no empirical evidence supporting the need for a drastically-increased sentence based solely on the purity of the methamphetamine at issue.[7]

Based on these observations, I concluded very early in my tenure as a district judge that the actual (and ice) methamphetamine Guidelines were too high – often by a substantial margin. Until now, I have been addressing this issue on an ad hoc, case-by-case basis, regularly granting downward variances when the advisory range was based on the actual (and ice) methamphetamine Guidelines. For some time, I have considered this approach to be unsatisfactory and have contemplated other solutions, including treating all methamphetamine as methamphetamine mixture. After reviewing Judge Bennett's decision in *Nawanna*, I became firmly convinced that this is the correct approach.

---

[7] In *Nawanna*, Judge Bennett noted that he invited the Government "to present any evidence that it wanted to support an empirical basis for the difference in treatment between ice and a methamphetamine mixture in the Guidelines." 2018 WL 2021350, at *5. He then wrote:

> The prosecution chose not to do so. Indeed, in its briefing and at oral arguments, the prosecution, to its credit and with great candor, did not challenge Nawanna's contention that the 10-to-1 ratio is unsupported by and not based on empirical evidence.

*Id*.

I cannot explain my reasoning any better or more concisely than Judge Bennett did in that case, so I will not try to do so. Instead, and as I did during Harry's sentencing hearing, I simply incorporate *Nawanna* by reference and reject the actual (and ice) methamphetamine Guidelines for all of the reasons set forth in that decision. In particular, I find both (a) drug purity is not an accurate proxy for culpability in light of the fact that nearly all of the methamphetamine cases brought in our district involve high-purity methamphetamine and (b) the 10-to-1 ratio established in the Guidelines is not based on empirical evidence.

Based on my policy disagreement with the actual (and ice) Guidelines, I will no longer apply them. Instead, by way of variance, I will calculate an alternative Guidelines range, starting with a base offense level determined by reference to the methamphetamine mixture Guidelines and then applying any applicable increases or decreases to that base offense level (e.g., aggravating or mitigating role and acceptance of responsibility). Once I arrive at an alternative total offense level, I will determine the alternative Guidelines range in light of the defendant's criminal history category.

Of course, calculating an alternative Guidelines range will not end the analysis. I will next consider the other factors set forth in 18 U.S.C. § 3553(a) to determine the appropriate sentence in each case. That sentence could fall within the adjusted Guidelines range or could be above or below that range, depending on my assessment of the relevant factors and circumstances.

I note that while my decision to reject the actual (and ice) methamphetamine Guidelines will necessarily result in reduced, alternative Guideline ranges, this will hardly constitute a windfall to defendants in methamphetamine cases. As noted above, even the less-harsh methamphetamine mixture Guideline ranges are (a) higher than the ranges for similar quantities of heroin and cocaine and (b) generally equivalent to the ranges for similar quantities of fentanyl and crack cocaine. And regardless of what the

alternative Guidelines range might turn out to be, in each case I will apply all of the relevant sentencing factors to arrive at a sentence I find to be "sufficient, but not greater than necessary." My decision to adopt the approach Judge Bennett described in *Nawanna* will, hopefully, lead to greater uniformity and predictability than my prior, ad hoc approach to the actual (and ice) methamphetamine Guidelines.

## V. APPLICATION TO THIS CASE

As noted in Section I(C), *supra*, reference to the actual (and ice) methamphetamine Guidelines resulted in a base offense level of 36, a total offense level of 38 and – given a criminal history category of VI – an advisory Guidelines range of 360 months to life in prison. After announcing that I was adopting *Nawanna*, I calculated an alternative base offense level of 32 by treating the 1,800.3 grams of ice methamphetamine as methamphetamine mixture. *See* USSG § 2D1.1(c)(4) (at least 1.5 kg but less than 5 kg of methamphetamine results in a base offense level of 32). I then added the two-level increase under USSG § 3C1.1 based on my finding that Harry provided false testimony during his trial, arriving at a total, alternative offense level of 34. Based on a criminal history category of VI, the alternative Guidelines range became 262 to 327 months.

I then considered the relevant sentencing factors, as set forth in 18 U.S.C. § 3553(a), to arrive at the ultimate sentence. In doing so, I rejected Harry's request for a downward variance on other grounds (i.e., a sentence below 262 months). In considering his history and characteristics, I found his long history of criminal conduct to be incredibly aggravating. I noted that Harry "checks all the boxes" for criminal behavior, as he has numerous convictions involving violence (PSR ¶¶ 32, 38, 41, 44, 46 and 54), theft or forgery (PSR ¶¶ 34, 50, 53, 58 and 59) and drugs (PSR ¶¶ 33, 40, 51 and 60). One of Harry's controlled substance convictions involved distributing drugs to

minors. PSR ¶ 60. Harry also has a conviction for escape (PSR ¶ 45) and a recent (2016) conviction for operating a motor vehicle while intoxicated (PSR ¶ 62).

Of particular concern to me was that Harry is now 42 years old but has not slowed his criminal behavior with age. His conviction for distributing drugs to minors occurred in 2010 and he initially received a suspended sentence, but due to various probation and parole violations he was repeatedly sent to prison, ultimately being released (again) on parole in August 2016. PSR ¶ 60. During his periods of supervision, he incurred new convictions for providing false identification (PSR ¶ 61) and, as noted above, operating a motor vehicle while intoxicated (PSR ¶ 62). The traffic stop that led to this case occurred on February 10, 2017, not long after Harry was released for his latest period of parole, and the cooperating witnesses who testified at trial discussed Harry's involvement in methamphetamine trafficking in 2016.

Other aspects of Harry's history and characteristics are less aggravating, or even mitigating. I noted, for example, that Harry has a significant mental health history and a recurring cocaine addiction. PSR ¶¶ 112-15, 119. He had a difficult childhood, reporting that he suffered physical and emotional abuse from his mother's boyfriends. PSR ¶ 105. He has never been married and has one child, now 17 years old, from a prior relationship. PSR ¶ 107.

I also considered the other relevant statutory sentencing factors. I noted that methamphetamine distribution is a serious offense and that Harry's involvement was significant, as he was responsible for over 1.8 kilograms. Due to Harry's lengthy criminal career, I found that a substantial sentence is necessary to protect the public from further crimes. I further noted that the need to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment and to afford adequate deterrence similarly required a lengthy term of incarceration. In weighing these and all of the other factors set forth in 18 U.S.C. § 3553(a), I concluded that a sentence below my alternative

Guidelines range was not appropriate. I further found that a sentence of 280 months, somewhat above the bottom of my alternative Guidelines range, was sufficient but not greater than necessary to comply with the statutory sentencing purposes. As such, I imposed that sentence, along with the statutory minimum term of supervised release, which is 10 years.

## VI. CONCLUSION

Because I have a policy disagreement with the actual (and ice) methamphetamine Guidelines, I granted Harry's request for a downward variance on that issue, concluding that a sentence within the Guidelines range of 360 months to life would be greater than necessary to comply with the sentencing purposes set forth in 18 U.S.C. § 3553(a). Instead, and for all of the reasons set forth above and described on the record, I concluded Harry should be committed to the custody of the Bureau of Prisons for a period of 280 months, followed by a 10-year term of supervised release. Judgment (Doc. No. 101) has been entered accordingly.

**IT IS SO ORDERED.**

**DATED** this 6th day of June, 2018.

_____
Leonard T. Strand, Chief Judge